```
 1                 IN THE UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION

 3    UNITED STATES OF AMERICA,       )
                                      )
 4                  Plaintiff,        )   CRIMINAL ACTION FILE
                    v.                )   NO. 1:20-CR-00408-MLB-5
 5                                    )
      TIERRE FREEMAN, ALSO KNOWN AS   )
 6    TIERRE FORD,                    )
                                      )
 7                  Defendant.        )
      _____ )
 8

 9


10    --------------------------------------------------------------

11             BEFORE THE HONORABLE MICHAEL L. BROWN
                     TRANSCRIPT OF PROCEEDINGS
12                         JUNE 8, 2022

13    --------------------------------------------------------------

14    APPEARANCES:

15    For the Plaintiff:        OFFICE OF THE U.S. ATTORNEY
                                  (By:  C. BROCK BROCKINGTON)
16
      For the Defendant:        MARK A. CAMPBELL, ATTORNEY-AT-LAW
17                                (By:  Mark A. Campbell)

18

19
                 Proceedings recorded by mechanical stenography
20                and computer-aided transcript produced by

21
                 JANA B. COLTER, FAPR, RDR, CRR, CRC
22                       Official Court Reporter
                         1949 U.S. Courthouse
23                       75 Ted Turner Drive, SW
                         Atlanta, Georgia  30303
24                          (404) 215-1456

25
```

```
 1                          _   _   _

 2                    P R O C E E D I N G S

 3        (Atlanta, Fulton County, Georgia, June 8, 2022, in open

 4   court.)

 5              THE COURT:  All right.  We are here for sentencing in

 6   United States v. Freeman.

 7              May I have appearances starting with counsel for the

 8   United States?

 9              MR. BROCKINGTON:  Good afternoon, Your Honor.

10              Brock Brockington for the United States.

11              Seated at counsel table is DEA Special Agent Bruce

12   Hernandez.  Also seated at counsel table is Lucy Groves, an

13   intern with our office, a rising 2L at Wake Forest University.

14              THE COURT:  Who's that?

15              MR. BROCKINGTON:  Lucy Groves, right here.

16              THE COURT:  Lucy Groves.  You're at Wake Forest?

17              MS. GROVES:  Yes, sir.

18              THE COURT:  Oh, good for you.

19              Do you like it there?

20              MS. GROVES:  I love it.

21              THE COURT:  All right.  I like Wake Forest.

22              All right.  Great.

23              MR. BROCKINGTON:  Thank you, Judge.

24              THE COURT:  And for the defendant?

25              MR. CAMPBELL:  Good afternoon, Your Honor.
```

1             Mark Campbell on behalf of Tierre Ford, also known as

2    Tierre Freeman.

3             THE COURT:  All right.

4             Mr. Ford or Mr. Freeman, what do you want me to call

5    you today?

6             THE DEFENDANT:  Mr. Ford.

7             THE COURT:  Mr. Ford, okay.

8             Have you had a chance to review the presentence

9    report that's been filed in this case?

10            THE DEFENDANT:  Yes, sir.

11            THE COURT:  Have you had a chance to go through it

12   with your lawyer?

13            THE WITNESS:  Yes, sir.

14            THE COURT:  All right.  I will start by telling you

15   what I have done to prepare.  Well, I can't get my computer to

16   come on, but I know what I've done to prepare.

17            I have read the PSR and I have read a couple of

18   sentencing memos filed by Mr. Campbell on behalf of Mr. Ford.

19            Is there anything else I should have read for today?

20            MR. CAMPBELL:  No, Your Honor.  However, if I may let

21   the Court know that I just recently received another letter on

22   his behalf.

23            THE COURT:  All right.

24            MR. CAMPBELL:  I've given a copy to Mr. Brockington,

25   and I have a copy for the Court.

```
 1              THE COURT:  Yes.  Why don't you send it up.

 2              MR. CAMPBELL:  Thank you, Your Honor.  It came in

 3    late.  I saw one letter was from a short-time Atlanta Hawk.

 4              THE DEFENDANT:  Oh, yes.

 5              MR. CAMPBELL:  Yes, sir.

 6              THE COURT:  Well, I guess a long-time -- was he a

 7    Buck for a long time, I think?

 8              THE DEFENDANT:  Yes, sir.

 9              THE COURT:  I think he won a championship.  If he's

10    the guy I'm thinking of, he won a championship in Texas.

11              THE DEFENDANT:  With the Spurs.

12              THE COURT:  With the Spurs, yes.

13              THE DEFENDANT:  Yes, sir.

14              THE COURT:  He was on that team with David Robinson

15    maybe.

16              THE DEFENDANT:  Yes.

17              MR. CAMPBELL:  Tim Duncan.

18              THE COURT:  No, Tim Duncan, that's right.

19              THE DEFENDANT:  Tim Duncan.

20              THE COURT:  And maybe Danny Green.  I don't know if

21    Danny was on that team.

22              THE DEFENDANT:  Yes, he was on the last one with him,

23    the first one, Danny Green.

24              THE COURT:  He's one of my all-time favorites.  I'm a

25    Carolina Tar Heels fan, so I like Danny Green and all those
```

1  guys that came from there.

2          At any rate, he had nice things to say about you.  I

3  read them all, but it's not always that I get a letter from

4  somebody who was a one-time Hawk, although not in the Hawk

5  heydays.  Although I do see Horford's giving them a hard time

6  now.  We couldn't keep him, either, I don't know.  At any rate.

7          Mr. Campbell, this letter is a well-done letter as

8  well, from Mr. Sills.  My question to you is:  I don't have a

9  lot of leeway in this case.  There's a mandatory minimum

10 sentence that applies, right?

11         MR. CAMPBELL:  That is correct, Your Honor.

12         THE COURT:  Do the folks know that?

13         MR. CAMPBELL:  They do, Your Honor.

14         THE COURT:  Okay.  Let me just wait -- I don't know

15 why my computer is fighting me today.  We could just talk more

16 about the Hawks.  I've got more thoughts about them, but I

17 don't know if that's the best use of our time.

18         But let me just say this:  I spent some time today

19 before coming out here going back over the PSR and looking hard

20 at whether or not there is an application of the safety valve.

21         Is there an argument to be made that there is?

22         MR. CAMPBELL:  Regrettably, I don't believe so,

23 Your Honor.  I don't --

24         THE COURT:  Mr. Brockington?

25         MR. BROCKINGTON:  I concur, Judge.  There's an issue

```
1   with a -- honestly, I was just speaking with Officer Logan
2   about this, but his criminal history, admittedly very old, but
3   a probation violation in 2009 essentially resurrected that and
4   put it -- made it such that it would actually count as the
5   three points and that one three-pointer, you know, will
6   foreclose the safety valve, that one three criminal history
7   points, I mean.
8           THE COURT:  Because the other one is the leadership
9   role or the manager role.
10          MR. BROCKINGTON:  And that as well, Judge.
11          THE COURT:  But that's really a factual issue that's
12  not really all that built out, he sent somebody to pick it up,
13  but I don't really see a way around that prior criminal
14  history.
15          Does anybody?
16          MR. CAMPBELL:  No, sir.
17          MR. BROCKINGTON:  Yeah.  And to be clear, Judge, with
18  respect to role, that was a recommendation in the plea
19  agreement, not a stipulation, so it would -- you know, it could
20  have been something that could have been litigated, however, it
21  was essentially moot because of the criminal history.
22          THE COURT:  Yes.
23          MR. BROCKINGTON:  We could fight about the guidelines
24  all day, in terms of the offense levels, but the criminal
25  history category is what's most unfortunate.
```

1          THE COURT:  Yes.  But the leadership would stop the

2    safety valve anyways.

3          MR. BROCKINGTON:  It would.

4          THE COURT:  But you could argue about that.

5          MR. BROCKINGTON:  Like I say, we could have litigated

6    it.  And the reason why I don't think there was an objection to

7    it, in terms of the PSR, was because it was essentially moot,

8    whether he won or lost, it wouldn't have mattered.

9          THE COURT:  Yes.

10         MR. CAMPBELL:  And, Judge, we certainly appreciate

11   that it could have been worse.  The government graciously

12   agreed not to file the 851 enhancement, which was well within

13   their prerogative to do so, at which point, if they had done

14   that, the Court would have been bound to sentence him to at

15   least 15 years.

16         THE COURT:  No, I agree.  I agree with that.  I

17   understand that that was part of the plea agreement or part of

18   the PSR noted that.

19         You'll have to bear with me another minute.  I don't

20   know why this is doing this to me.

21         Ms. Kelley, maybe I should have listened to that guy

22   that said I needed to update my computer.

23         All right.  Now I'm on.

24         Well, it is obviously a serious offense.  So the

25   reason it counts, I mean, it was a --

1          MR. BROCKINGTON:  It was like '96, I think.

2          THE COURT:  Yes, a '96 conviction for conduct in '94,

3   but it's resurrected for our purposes because he had the

4   probation violation in '09.

5          MR. BROCKINGTON:  That's my understanding, Judge.

6          THE COURT:  And that was for failing to pay a fine?

7          PROBATION OFFICER:  It was failing to pay a fine and

8   failing to report as directed, Your Honor.

9          THE COURT:  Okay.  Well, it sure has an outsized

10  impact.

11         MR. BROCKINGTON:  I would agree.

12         THE COURT:  Maybe some day they'll do something that

13  will change it, but this is one of those instances where I just

14  disagree with the mandatory minimum sentences.  I'm not saying

15  it should be half of it, but, I mean, the guidelines set a

16  different standard that's maybe more in line with it, but I

17  don't know.  It's a shame.

18         You know, they make some changes to the guidelines,

19  and I'm sure that that application of it, resurrecting a 1996

20  conviction is just a devastating impact that I'll bet nobody

21  ever thought of the way that would work there, but it does, and

22  it has a big impact.  At any rate, that is regretful.

23         I don't believe that there were any objections to

24  either the factual findings or the guideline calculation; is

25  that right?

1          MR. BROCKINGTON:  None from the government.

2          MR. CAMPBELL:  None for Mr. Ford, Your Honor.

3          THE COURT:  Well, I will adopt both, specifically the

4    following calculation:

5          We start with a base offense level of 30, under

6    2D1.1, based upon the weight of the narcotics, two levels are

7    added because he was an organizer or leader, and I would -- we

8    could -- as Mr. Brockington said, we could argue about the

9    application of that, if it mattered.  It doesn't wind up

10   mattering, and for that reason, it has not been objected to,

11   but there could be factual arguments that could be made,

12   adjusted offense level of 32, with three levels off for

13   acceptance of responsibility is a 29.

14         How old are you, sir?

15         THE DEFENDANT:  46, sir.

16         THE COURT:  46.  Based upon his conviction when he

17   was 17 years old, I add three criminal history points.  He has

18   a score of three and that puts him in criminal history category

19   two.  Under the guidelines, 29 and two is 97 to 121 months, and

20   but for that conviction, he would be 87 to 108 months, which I

21   personally think is infinitely more reasonable, but because the

22   mandatory minimum sentence is the inapplicability of the

23   sentencing guidelines, his recommended guideline range becomes

24   the mandatory minimum of 120 months, fine of $30,000 to

25   $10 million, special assessment of $100, as well as forfeiture

1  of the Escalade, I thinks it is; is that right?

2              MR. BROCKINGTON:  That's correct.

3              THE COURT:  Any objection to that calculation of the

4  guidelines or the manner in which I've done so?

5              MR. BROCKINGTON:  None from the government.

6              MR. CAMPBELL:  No, Your Honor.

7              THE COURT:  That takes us to the 3553 factors.  I

8  have considered all of the 3553 factors today before coming out

9  here.  It was one of the reasons that I tried to look and see

10  if there was a way of the safety valve, because although I

11  think that, obviously, narcotics are inherently dangerous, and

12  the defendant had a significant role in this criminal activity,

13  and also it is worth noting that it was over a fairly long

14  period of time, if not days-wise, it was over a number of

15  different instances where he was caught on the wiretap picking

16  up or delivering or sending people to get, and it ran for some

17  length of time, but also was repetitive, which would indicate

18  that what we have here was really a slice of life, just a

19  moment of probably ongoing activity, so obviously, that makes

20  it more serious.

21              But the other things that one would consider under

22  3553, other things about this defendant, would weigh in his

23  favor.  Anybody else want to say what they think the sentence

24  ought to be applying the 3553 factors?

25              I've looked at them all.  If I had the discretion, I

1   would go below the mandatory minimum.  I don't need to say

2   where I would sit.  I offer that to you, because I think you

3   both want me to do the mandatory minimum.

4           Is that right, Mr. Brockington?

5           MR. BROCKINGTON:  I mean, the United States would

6   like to be heard on 3553.

7           THE COURT:  Sure.  We ought to do that.

8           Go ahead.

9           MR. BROCKINGTON:  And, Judge, I'll be brief, because

10  I understand that you've prepared for today, you're familiar

11  with the facts in the PSR, so I'm just going to address the

12  nature and circumstances and the history and characteristics,

13  again very briefly.

14          THE COURT:  There was at least one gun found in the

15  search, right?  I know there was a gun found at one of the

16  co-defendant's houses.

17          MR. BROCKINGTON:  Yeah.  There was no gun connected

18  with Mr. Ford, though.

19          THE COURT:  Right.  No.  I'm just saying --

20          MR. BROCKINGTON:  But as part of the conspiracy, yes.

21          THE COURT:  I'm just saying the inherent

22  dangerousness of dealing drugs.

23          MR. BROCKINGTON:  Oh, without a doubt.  Without a

24  doubt.

25          Again, I will focus mainly on the arrangement of the

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

1  three-kilogram cocaine deal with Mr. Clark that was captured

2  over the wiretap.  Again, the part that is troubling and, in

3  this case, very unfortunate is that, you know, Mr. Ford rather

4  than do this dirty work himself sent an individual to pick up

5  the three kilograms of cocaine.

6          Ultimately that individual was stopped, the car was

7  searched and the narcotics were seized.  And immediately after

8  that courier, who was co-defendant Lamon Brown, attempted to

9  contact Mr. Ford, Mr. Ford hung up on him and then right after

10 that telephone call, he contacts Clark to discuss a traffic

11 stop, which was essentially eliminating any doubt that he was

12 somehow not involved in what was going on.

13         Again, there were several other deals that were

14 captured over the wire that did not result in seizures.

15         But I will say that it is unfortunate that Mr. Ford

16 got Mr. Brown involved, because by all accounts, that was a

17 family friend.  And we'll be having another difficult

18 conversation with Mr. Brown in this case.

19         With respect to his history and characteristics,

20 Judge, there are multiple convictions for narcotics

21 distribution.  I'll direct your attention to Paragraph 112 of

22 the PSR.  There's a 1996 cocaine trafficking.  Ultimately,

23 that's what resulted in the later 2009 probation violation.

24         But there's another one in Paragraph 113, in 1995,

25 cocaine trafficking.  It might have been cocaine trafficking,

1 it may have been, you know, one instance of drug distribution

2 that spanned two counties, because it appears to be very

3 similar.

4          There's also a conviction in 2000 for carrying a

5 concealed weapon, that's Paragraph 114.  I will note that there

6 are almost six other arrests, all before Mr. Ford turned 19

7 years old -- or before he turns 20 years old.

8          And it looks like there was an arrest for marijuana

9 distribution in 2010.

10          THE COURT:  I know, but isn't that part of the

11 remarkableness of it?

12          MR. BROCKINGTON:  Oh, my very next note, Judge, is to

13 acknowledge that this criminal history is all very old.

14          THE COURT:  Yes.

15          MR. BROCKINGTON:  So old that it would not have even

16 counted against him, but for the probation violation.

17          And I do want to thank Mr. Campbell for bringing this

18 up, but I wanted to -- and it bears mentioning that the

19 government did consider concessions to make in this case.

20          Again, there was a potential for enhancing this

21 sentence from 10 to 15 years, again, because of the -- his

22 prior conviction, and the government chose not to do that.  We

23 opted not to enhance his sentence and we did not file an 851

24 notice, and that's Page 4, Paragraph 12 of the plea agreement.

25          Judge, this is a time when your hands are tied,

1  unfortunately.  So there's not a whole lot of discretion at

2  this point, but I do want you to know that it -- in two ways,

3  one, it went from 15 down to 12 -- excuse me, 15 to 10 years,

4  and if there were no mandatory minimum, the 120 months is still

5  within the guideline range of a Level 29, Category 2.

6         Now, I understand your point, and it's well taken

7  that he should be a 29, 1.  You believe he should be a 29, 1,

8  which would be 87 to 108.  I say all of that to say 120 months

9  will -- certainly takes into -- taking into account all of the

10  3553 factors, the government is asking for no more than 120

11  months.  That sentence will provide respect for the law, just

12  punishment, and perhaps if there's anything to come from this,

13  some specific and general deterrence.

14         I would hope that you will never hear from Mr. Ford

15  again in any court for any sort of criminal violation.

16         And then the general deterrence as well.  I mean, he

17  certainly has got a community of folks behind him, and that's a

18  cautionary tale that hopefully there's some young man who

19  decides to, you know, make a left turn instead of the wrong --

20  or make a right turn instead of the wrong, you know -- wrong

21  left turn and find himself going down this same path that

22  Mr. Ford has.

23         So for all those reasons, Judge, the government's

24  recommendation is the mandatory minimum of 120 months.

25               THE COURT:  Mr. Campbell?

1          MR. CAMPBELL:  Thank you, Your Honor.

2          Your Honor, present in the courtroom today in support

3   of Mr. Ford are Emmanundia Ford, his wife; Henderson Maddox,

4   his cousin; Corey Freeman, his brother; Donnell Gordon, his

5   cousin; Kiera Gordon, his cousin; Vasco Whiteside, a friend;

6   Tierre Ford, his son; Brenda Barthell, his mother; Jacqueline

7   Whitaker, his mother-in-law; Melvin Jacobs, his cousin.

8          There are also two -- there's Frankie Smith, Frank

9   Smith, a friend; Cory Andrews, a friend, and there are two

10  others, Patrice Gordon and Needra Kendricks, they're both

11  cousins, they're outside the courtroom with babies.  I

12  indicated that it would be best that children, babies not be in

13  the courtroom.

14         Your Honor, Ms. Emmanundia Ford, his wife, would like

15  to address the Court.

16         THE COURT:  Sure.

17         MR. CAMPBELL:  Ms. Ford.

18         MS. FORD:  Good afternoon, Your Honor.

19         Thank you so much for the opportunity to speak on

20  behalf of my husband, Tierre Ford.

21         We were married in September of 2011, so in September

22  of this year, it will be 11 years.  I am very honored to be his

23  wife.  I'm very proud of him and the changes and the

24  accomplishments that he -- he has made in his life since those

25  earlier convictions that you mentioned earlier.

1          He has done such a phenomenal job being a husband and

2     a tremendous support to me.  We have three children combined,

3     my oldest bonus son is Tierre, he is an entrepreneur, such a

4     very talented artist, and his father has been so supportive as

5     he's found himself and found his true gift in life.

6          Our other two children are 19 years old, Chancellor

7     Ford.  Chance graduated from college -- I mean graduated from

8     high school last year.  And I was very thankful that Tierre was

9     allowed to attend his graduation.  Unfortunately, he could not

10    go to his school to move him in his dorm and to meet all of his

11    friends.  He played basketball for Brewton-Parker College, and

12    he couldn't meet his teammates.  We FaceTimed as much as

13    possible and videoed, so that he could be a part of the

14    experience.

15         But those are moments that Tierre would have

16    definitely been there, because he's such a supportive father

17    and was so instrumental in the accomplishments that our son was

18    able to make.

19         We also have a 9-year-old, Jackson, who waved

20    good-bye to us as we left to come down here and prayed with us

21    prior to leaving.

22         My oldest -- my oldest biological son, Chancellor led

23    the prayer and just praying for some leniency and for kind

24    hearts and minds to be able to see the man that sits before

25    you.

```
 1            That although Tierre acknowledges what he has done,
 2   and we have spent the last year and a half since he's been on
 3   home incarceration really doing a reset.  It happened during
 4   the pandemic.  Life was already different.  And then our lives
 5   became even more different in this case.
 6            And so we've spent this time as a family just being
 7   able to bond and be together more, spend a lot more time
 8   together.  Tierre has spent this time in true meditation and
 9   reflection and understanding his role, accepting
10   responsibility, and just knowing that a huge void is going to
11   be left in the lives of his family, us, of course, his wife and
12   children, but also all of the people that you see sitting
13   behind us today.
14            He's managed to accomplish a lot.  I'm going to do
15   everything I can to just continue his legacy, while he is away
16   from us.  I am hoping that he is close enough for us to be able
17   to visit as frequently as possible, because he needs to see the
18   children grow, he needs to see them develop and they need to
19   see him.
20            I thank you for what I think you were trying to do
21   earlier, as I was jotting down all of the legalese and trying
22   to have some leniency, but I do understand your charge here
23   today.
24            And also, I am very appreciate for having him home
25   for the last year and a half.  We are going to miss him.  He
```

1   inspires us all to just try hard, push forward.  As an

2   educator, I am truly inspired by the fact that Tierre was a

3   nonreader as an adult.  And during his time, he took the

4   opportunity to learn to read himself, to read books, and then

5   later became an author, and so I just admire that.

6          We love him.  We're going to support him no matter

7   what the outcomes are.  He will get support.  And I just thank

8   you for the opportunity to speak.

9          THE COURT:  Thank you.

10          MR. CAMPBELL:  Thank you, ma'am.

11          Your Honor, Mr. Henderson Maddox would also like to

12   address the Court.  Mr. Maddox.

13          MR. MADDOX:  Thank you so much, Your Honor, for

14   allowing me to speak.

15          I think the simplest thing I can say is that, for me,

16   growing up in an environment and just kind of wanting a better

17   life, I'm a filmmaker, I was an educator for eight years,

18   throughout my journey, Tierre has been, I think, my biggest

19   support system.

20          It's hard as an African-American male to thrive in

21   many industries.  There is no one that I can say has pushed me

22   more, who has given the dedication, the time, the energy,

23   whatever it is to make that happen.  We are cousins by my

24   grandfather, so we're Fords, and some of the accomplishments

25   that we're able to do are some things that I think no one that

1  comes from where we're from has dreamed to be able to do.

2         We've created products from our history of things

3  that we've, you know, been through, what we watch our family go

4  through.  I think that there is a power in medicine in a story.

5  So we have been able to through a lot of his books and from

6  some of the films to be able to tell the story and the struggle

7  of, you know, where we come from and what we've been through to

8  inspire other youth to not make decisions and to see that they

9  can be, you know, whatever they want to be and not have to

10 necessarily be a product of a certain environment.

11        So I think that I definitely appreciate your

12 leniency.  We have so many stories to tell.  We have so much

13 work to do.

14        So for me, I just want him -- him as quick as

15 possible so that we can continue to tell those stories, and

16 continue to inspire a generation, because that's the only way

17 that we can change the people that's behind us.

18        THE COURT:  Understood.  Thank you.

19        MR. CAMPBELL:  Thank you.

20        THE COURT:  Finally, Your Honor, Mr. Ford would like

21 to address the Court.

22        THE DEFENDANT:  How are you doing, Your Honor?

23        THE COURT:  I'm doing all right.

24        THE DEFENDANT:  First, I just want to give an apology

25 for my actions.  I have a good support system.  And when we did

1   the movie, I had, you know -- you would think, you know, when

2   you do something big, you think when you go to sleep, wake up,

3   it will happen.  And it didn't happen like as far as the

4   success said part, but the story got told, the book got turned

5   into a movie and basically I just got inpatient.

6         I had walked away, as they called it, from the game,

7   because I had committed to God, like if you help me to get to

8   the point, but it just didn't work out and I just lost

9   patience, and I'm paying for it now and I accept it.

10        My lawyer has done explained to me it won't matter,

11   but I just want to speak on two years of the probation

12   violation.  It was one of them things where my probation at the

13   time had got locked up for stealing gift cards.  I was saying

14   that -- you know, my fine was $200,000, so I was ordered to pay

15   $1,000 a week, and I was like that's impossible with kids and

16   trying to live, but I did pay, like 200 a week.

17        So when I went to court, and what happened was I -- I

18   used to manage groups, so we was on a road trip.  One person in

19   the car had some weed in the car to smoke, you know, when he

20   get to the show.  And he just throwed the weed down on the

21   floor and locked -- all of us got locked up, but I was the one

22   on paper, so I got violated, of course.

23        But -- but when I got to the court, the judge just

24   decided to take me off, I still had about 7 years of probation

25   left and a big fine, so they were like if you plead to one

1  year, we'll just -- you know, of course I didn't know it would

2  affect me -- doing that would affect me like that, because I

3  never got charged with it, but I see it still went down as a

4  violation, so it's in there.

5          So and it just, you know, it's just hard, and so I do

6  think -- I thank you for really going through and taking time

7  to try to see me as a person.  And I'm going to do everything I

8  can to better myself, to raise my kids, come home and help the

9  community.

10          Because I used to go to the schools, I used to go to

11  the juveniles, I done went to colleges and spoke on a lot of

12  panels, and like I say, I just -- I lost faith, I lost faith

13  and at the wrong time and this happened.  And I accept it.

14          And I just -- I just pray that, you know -- well, as

15  they say, you know, the mandatory minimum is -- nothing can be

16  done, so I accept it.  And I still just want to thank you,

17  because I saw you was up there shifting and just trying to

18  figure it out.  And I don't see that much.

19          THE COURT:  I spent time today and before trying to

20  read any way I could come up with of it.  When you look at how

21  old it is and how it was reinvigorated with the probation, and

22  what, at least in writing the probation was, I tried to see if

23  there was any crafty lawyering that could be done, and I'm just

24  afraid there's not.  And if I could make an argument, I would

25  probably accept my own argument for it, but there's just not an

 1  argument to be made there.

 2          THE DEFENDANT:  Yes, sir.

 3          THE COURT:  It's an unfairness or illogical

 4  application, it's in my opinion something is wrong with that

 5  part of the law, but it is what it is, and, you know, I have to

 6  follow the law.  I know you know that.  I have to follow the

 7  law --

 8          THE DEFENDANT:  Yes, sir.

 9          THE COURT:  -- regardless.  I mean, you can't have

10  judges not following the law, so...

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  So at any rate, I understand.  Okay.

13          THE DEFENDANT:  Thank you.

14          THE COURT:  Anything else from anybody?

15          MR. CAMPBELL:  No, Your Honor.  I'll just sum up.

16          THE COURT:  Sure.

17          MR. CAMPBELL:  And that simply is, Judge, from humble

18  beginnings came Mr. Ford.  He could not read until he became a

19  young adult.  He made very terrible decisions as a young adult

20  that landed him behind bars before he was 18 years old.

21          When he got out, he taught himself how to read.  He

22  wrote books, those -- one of those books became a movie, a

23  movie that can be viewed today on Amazon.  It's a powerful

24  story.  The Products of the American Ghetto, talking about from

25  where he came.

1          He's a successful entrepreneur with ideas and moxie

2     and hard work.  He's been derailed regrettably by bad

3     decisions.  He admitted that he lost patience.  He admitted

4     that he wanted that ring a little faster than he otherwise

5     would have earned it through his hard work.

6          But he stands here before you today fully repentant,

7     fully accepting responsibility and accepting that the Court

8     simply has no discretion, therefore, Judge, we ask the Court to

9     sentence him to 120 months, the mandatory minimum, to the bare

10    minimum supervised release, which I believe the law requires,

11    five years.

12         Judge, we ask that the Court recommend that the

13    Bureau of Prisons consider him for admission into the

14    residential drug assistance program.  The PSR reflects that he

15    has been a virtual daily user of marijuana, that can certainly

16    contribute to the bad decision making.

17         But most importantly, Judge, we ask that you

18    recommend that the Bureau of Prisons designate him for

19    incarceration at a facility as close as possible to Atlanta so

20    he can stay close to this enormous support network that he has

21    here in court today.

22         Thank you very much.

23         THE COURT:  Thank you.  All right.  I don't mean by

24    what I say to suggest that this is not a serious offense, it

25    is, and the guidelines do a fairly good job, I think, of

1   approximating the seriousness of it that could in a very real

2   way be dialed in, I think, under 3553 to a sentence that is

3   sufficient but not longer than necessary.  And I feel like I

4   could do that, given the guidelines and the facts that I know

5   and the things that I've been told.

6           I've been told a lot about the defendant.  And I

7   think the biggest thing is just that he was 19 when he did most

8   of the stuff that he did and he's 47 years old now, and that's

9   a huge period of not getting into any problem.

10          I know there was a 2011 marijuana, but it didn't lead

11  to anything.  But that's a lot of time of your life when you

12  really do show who you are, and most people, especially most

13  people my age would say they would never want to be defined by

14  who they were at 19.  And unfortunately, for this defendant,

15  it's having a big impact on him, which is regretful.

16          If the guidelines did not -- if the mandatory minimum

17  did not exist, I firmly believe that I could set a better

18  sentence that more closely approximates the 3553 factors and

19  that imposes, while a serious sentence, one that was not

20  greater than is necessary, because I do believe that 120 months

21  for a 47-year-old man is greater than necessary, particularly

22  for the reasons I've said about the things he's done, although,

23  I get it, that the things he did here, I doubt very much that

24  he was caught with the full extent of the criminal activity he

25  was engaging in at the time.  I'm not obtuse to that, either,

but I just regret the fact that the law in this instance precludes a more thoughtful application or any application of 3553.

But I shouldn't say that, because there would be instances where I have gone over the mandatory minimum, because the guidelines would call for that.  There are plenty of times that I've gone over the mandatory minimum because the guidelines call for that, but in this instance, the mandatory minimum limits how much I can dial it in.

So I will do what everybody is asking me to do and sentence the defendant, pursuant to the Sentencing Reform Act, to the custody of the Bureau of Prisons to be imprisoned for the statutory minimum term of 120 months.  He has to pay a $100 special assessment, due immediately.

The Court will waive the fine and cost of incarceration.

Probation officer, somebody handed you something a minute ago.

PROBATION OFFICER:  Oh, no.  That was his report, Your Honor.  I had left it upstairs.

THE COURT:  I was hoping it might be some other illumination and I made a note.  I didn't want to skip over that possibility.

PROBATION OFFICER:  No, sir.

THE COURT:  Okay.  I'm sorry.

1          I'm waiving a fine or cost of incarceration.  The

2  defendant has some net worth, but he also has a fairly

3  extensive family, and I don't think he has the ability to pay

4  either.

5          He has to forfeit his interest in the 2010 Cadillac

6  Escalade.  I'll put the VIN number in my written judgment.

7  Upon release from imprisonment, he will be on a term of

8  supervised release for four years.

9          Is that the minimum?

10          MR. BROCKINGTON:  It's got to be five, Judge.

11          THE COURT:  It's got to be five.  Okay.  Thank you.

12  I thought that four was odd.

13          You must report to a probation officer in the federal

14  judicial district where you're authorized to reside within 72

15  hours of release from your imprisonment, unless you are given

16  other instructions.

17          You must comply with the mandatory conditions of

18  release.  You must not commit another federal, state or local

19  crime.  You must not unlawfully possess a controlled substance,

20  or unlawfully use a controlled substance, and you must submit

21  to one drug test after 15 days of release from imprisonment and

22  at least two periodic drug tests thereafter.

23          You must also cooperate in the collection of DNA.

24          You must comply with the standard conditions of

25  supervision.  They're imposed because they set the basic

1  expectations for your behavior and the minimum tools our

2  probation officers need to do their job.

3          You must also comply with the following special

4  conditions.  You must submit to substance abuse testing to

5  determine if you've used a prohibited substance and must not

6  obstruct, attempt to obstruct or tamper with any testing

7  method.

8          You must also participate in substance abuse

9  treatment and evaluation under the guidance of your

10 probation officer, who will work to determine with the provider

11 the details of the plan.  I will include these written

12 conditions, special conditions, as well.

13         I am not requiring you to pay any part of either the

14 testing or the substance abuse treatment program, but you must

15 participate in the substance abuse treatment program and also

16 submit to substance abuse testing to confirm your compliance

17 with the mandatory conditions.

18         Any other mandatory conditions -- or, I'm sorry, any

19 special conditions anybody thinks we ought to include?

20         MR. BROCKINGTON:  None that I can think of, Judge.

21         MR. CAMPBELL:  Only the recommendations we requested.

22         THE COURT:  I will make those two recommendations,

23 that he participate in the RDAP program, for the reasons that

24 Mr. Campbell has identified.

25         I will also recommend that he be designated to a

1  facility in Atlanta or close to Atlanta as possible.

2            Okay.  Mr. Ford, you have to remember or you have to

3  know -- I want to make sure you know that you waived your right

4  to appeal in the plea agreement, your conviction or your

5  sentence.

6            To the extent you think you have the ability to do so

7  and you want to appeal either your conviction or your sentence,

8  you have to file that within 14 days of today.

9            There are some costs associated with it.  You can

10  apply to have those waived.  You can also apply for the

11  assistance of counsel.

12            Mr. Campbell, will you talk with your client about

13  his appellate rights?

14            MR. CAMPBELL:  I will do so today.

15            THE COURT:  All right.  Anything else?

16            MR. BROCKINGTON:  Nothing from the government.

17            MR. CAMPBELL:  No, Your Honor.  Thank you.

18            THE COURT:  Were you going to say something,

19  Mr. Brockington?

20            MR. BROCKINGTON:  No, I thought you were going to say

21  something, Judge.

22            THE COURT:  Well, I am going to ask about whether I

23  need to remand the defendant.  He has remained out on bond for

24  a long time under supervision or monitoring.

25            What do you-all say about that?

1          MR. BROCKINGTON:  Judge, we have talked about this a

2    lot, in terms of 18 U.S.C. 3143, as an officer of the Court,

3    Judge, I have to tell you that it compels attention, unless

4    there are exceptional reasons, and that would be on the burden

5    of the defendant to make that determination.

6          We have talked about this a number of times.  You've

7    asked me in terms of, like, how my office feels about this.  In

8    terms of exceptional reasons, Judge, I mean, there are -- there

9    was no cooperation here, so I was going to say that, you know,

10   typically that tends to be what is proffered as an exceptional

11   reason.

12         I did what you asked me to do, Judge, which was to go

13   back and take a look at that law.  And, in fact, and I will

14   admit with the assistance of an extern, I had them do an entire

15   circuit survey of 3145 exceptional reasons.

16         So what we have found ourselves doing is I have -- I

17   don't make an affirmative ask, but if you -- on behalf of the

18   government, but if asked, Judge, what to do now, all I can do

19   is read 3143(a)(2) and then turn it over to my colleague,

20   Mr. Campbell.

21         THE COURT:  Okay.  Mr. Campbell, I think the law says

22   that I have to remand him into custody.

23         MR. CAMPBELL:  3143(a)(2) says:  The judicial officer

24   shall order that a person who has been found guilty of an

25   offense in a case described, this one, unless (a)(1) and (2),

 1 | which do not apply here, it says and then (b), the judicial
 2 | officer finds by clear and convincing evidence that the person
 3 | is not likely to flee or pose a danger to any person or the
 4 | community.
 5 |         I do not expect this argument to carry a great deal
 6 | of weight.
 7 |         THE COURT:  Wait.  I'm not sure you've read it the
 8 | right way.  It's -- you have to have either (a)(1) or (A)(i) or
 9 | (A)(ii) and (b).  The judicial officer finding that he's not
10 | likely to flee or pose a danger to the community.  I don't
11 | think he's likely to provide any danger to the community.  I
12 | don't think he's likely to flee.  I can find B, no problem.
13 |         MR. CAMPBELL:  Well, as I was about to say, years
14 | ago, when I went through the training program at the
15 | United States Attorney's Office -- and I told Brock I'd be
16 | telling the Court this -- the well-known Mary Jane Stewart
17 | explained to us very clearly that in federal law and means or.
18 | I would like it -- if the Court is inclined to remand him, I
19 | would like just a limited opportunity to brief that specific
20 | issue, does and mean or in this particular case.
21 |         THE COURT:  What you're referring to is the old
22 | saying that allege in the conjunctive, prove in the
23 | disjunctive.
24 |         MR. CAMPBELL:  It is.
25 |         THE COURT:  That is not in any way a statutory

1  interpretation.  I don't think that you could find any

2  authority for that proposition.  I don't think that you could

3  find any -- I mean, I'm tempted to ask the law student, but

4  that's not even a straight face test.

5        MR. CAMPBELL:  Well, that's why I'm not claiming to

6  have a case that would make that statement, Judge.  I'm simply

7  saying that's the best that we have.

8        THE COURT:  I'm sorry.  I can't -- I cannot just turn

9  a eye to what the law says because of what I would like to do.

10  I can't.  I think you both know that.

11        Mr. Brockington would not object TO it, that's why he

12  didn't want to bring it up.

13        But do you-all really not think that the law requires

14  it?  Tell me that you don't think the law requires it.

15        Do you think it requires it, Mr. Brockington?

16        MR. BROCKINGTON:  Judge, for every conviction we've

17  had in here you have asked me that question and then you have

18  admonished me and sent me down to do some of research, and I

19  have, every time, said if he doesn't ask, I'm not going to say

20  anything, but I've done what you've asked me to do, we've done

21  the research, we've looked at every circuit.

22        And the way that I read this is a threshold issue to

23  even getting to whether or not there is clear and convincing

24  evidence of flight or danger is whether or not the judicial

25  officer finds that there's a substantial likelihood that a

1    motion for acquittal or a new trial will be granted or that an

2    attorney for the government has recommended that no sentence of

3    imprisonment be imposed on the person.

4           Very frankly, Judge, in any time we find ourselves in

5    3143(a)(2) in my office, those will never apply.  It has been

6    one of the most often ignored statutes, by mutual agreement,

7    but again, you would -- you would not be following the law if

8    you simply ignored it.  That is harsh, and I completely

9    understand.

10          THE COURT:  No.

11          MR. BROCKINGTON:  And it's why it is -- you know, it

12   has been ignored for so long.

13          THE COURT:  And that's why the often ignored thing is

14   so inappropriate, because then it gives the discretion to

15   somebody to invoke it when they want and that's when you start

16   treating people unfairly, and that's when you start treating

17   people for something other than what the law says, personal

18   preference or whatever else.

19          Mr. Campbell?

20          MR. CAMPBELL:  Judge, would you allow Mr. Ford a few

21   minutes to say good-bye to his family before he is remanded?

22          THE COURT:  I'll tell you what, we'll be in recess

23   for five minutes.  Okay?  I'll be in recess for five minutes.

24   Okay?

25          MR. CAMPBELL:  Thank you.

1        THE COURT:  All right.

2                   (Whereupon, a recess was taken.)

3        THE COURT:  All right.  Have I asked both parties --

4  any objection to the sentence I've imposed or the manner in

5  which I've done so?

6        MR. BROCKINGTON:  No objection from the government.

7        MR. CAMPBELL:  No objection, Your Honor.

8        THE COURT:  Okay.  Then I am going to remand the

9  defendant to custody, as I think I am required to do so.

10        And with that, I think we are adjourned.  Okay?

11        Thank you, Mr. Brockington.

12        MR. BROCKINGTON:  Thank you, Judge.

13        THE COURT:  Thank you.

14        MR. CAMPBELL:  Thank you, Your Honor.

15        THE COURT:  Thank you.

16

17        (Whereupon, the proceedings were adjourned at 3:07

18  p.m.)

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA

REPORTERS CERTIFICATE

1

2

3

4          I, Jana B. Colter, Official Court Reporter for the

5     United States District Court for the Northern District of

6     Georgia, with offices at Atlanta, do hereby certify:

7          That I reported on the Stenograph machine the

8     proceedings held in open court on June 8, 2022, in the matter

9     of United States of America v. Tierre Freeman also know as

10    Tierre Ford, Case Number 1:20-CR-00408-MLB-5; that said

11    proceedings in connection with the hearing were reduced to

12    typewritten form by me; and that the foregoing transcript (33

13    Pages) is a true and accurate record of the proceedings.

14          This the 29th day of August, 2022.

15

16

17

18          _____

19          /s/ Jana B. Colter, FAPR, RDR, CRR, CRC
                    Official Court Reporter

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA